## Robert CAVENS, M.D., Appellant–Defendant,

v.

## Tim ZABERDAC, Individually and as Administrator of the Estate of Peggy Miller, Deceased, Appellee–Plaintiff.

### No. 45A03–0312–CV–516.

Court of Appeals of Indiana.

Jan. 20, 2005.

Robert D. Brown, Spangler Jennings & Dougherty, P.C., Merrillville, IN, Attorney for Appellant.

Thomas A. Clancy, Jeanine L. Stevens, Clancy & Stevens, Chicago, IL, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Dr. Robert Cavens appeals the entry of judgment against him in the amount of $750,000 in a medical malpractice action brought by Tim Zaberdac, individually and as administrator of the estate of Peggy Miller. We reverse and remand.

### Issue

The issue we address today is whether the trial court erred in granting Zaberdac's motion for judgment on the evidence with respect to Dr. Cavens' claim of contributory negligence on Miller's part.[1]

### Facts

Because courts must view the evidence in a light most favorable to the non-movant when reviewing the grant of a motion for judgment on the evidence, the following facts are stated in a light favorable to Dr. Cavens' contributory negligence claim. Miller suffered from severe, persistent asthma. Her treating pulmonologist, Dr. Mary Strek, said it was one of the worst cases she had ever seen. Between October 1990 and April 1996, Miller was hospitalized eight times because of severe asthma attacks. Dr. Strek advised all of her asthma patients to "certainly" seek emergency room treatment if they are experiencing a severe asthma attack that does not respond to three Albuterol treatments. Tr. p. 542. Dr. Strek also told Miller that she relied too heavily on self-administered epinephrine injections ("epi-pen") when she had asthma attacks and that, instead, she should seek early emergency room treatment when she experienced a severe attack. There is a danger that overusing asthma medication such as Albuterol will make an attack worse, or reduce the effectiveness of subsequent medical treatment, by causing increased spasms in the airways of the lungs.

Miller began experiencing shortness of breath on the evening of July 20, 1996. Her difficulty breathing became profound around 7:00 a.m. on July 21. In response to this asthma attack, Miller took several doses of Ventolin, a prescription asthma medicine, used her Albuterol nebulizer up to seven or eight times,[2] and used her epi-pen three to four times "with very limited success." Tr. p. 1005. Miller called a friend of hers around 11:00 a.m. The friend called an ambulance at 11:29 a.m. Miller arrived at Munster Community Hospital approximately half an hour later in extreme distress. Dr. Cavens was the emergency room physician who initially treated

---

1. Our resolution of this issue makes it unnecessary to address Dr. Cavens' arguments regarding the limitation of his closing argument and the refusal of one of his tendered jury instructions.

2. Ventolin is a brand name for Albuterol. It is unclear from the record whether Miller used two different forms of the drug repeatedly, i.e. perhaps by administering the Ventolin via an inhaler while administering Albuterol via a nebulizer.

her, including intubating her at 12:15 p.m. At 12:25 p.m., Miller went into cardiac arrest. Dr. Cavens attempted several measures to save Miller and was about to declare her dead when her heart started beating again. She was transferred to the care of another physician, who performed surgery on Miller, including the removal of one of her lungs, but her condition continued to deteriorate and she died at 11:45 p.m. on July 21.

On August 5, 1998, Zaberdac filed a medical malpractice complaint against Dr. Cavens.[3] Dr. Cavens' answer asserted, in part, that Miller's death resulted from her contributory negligence. On August 22, 2001, all three members of a medical malpractice review panel concluded that Dr. Cavens was not negligent in his treatment of Miller. Nevertheless, the case proceeded to jury trial commencing November 12, 2003, and concluding on November 24, 2003. Zaberdac presented the testimony of three physicians who asserted that Dr. Cavens was, in fact, negligent in his treatment of Miller and that such negligence was a cause of her death.[4] The central claim of negligence made by all three doctors was that Dr. Cavens ordered respiratory therapists helping Miller breathe by use of assisted ventilation to do so at too high of a rate of breaths per minute, which led to hyperinflation of Miller's lungs, followed by increased pressure on her heart, and ultimately resulting in the cardiac arrest. These doctors opined that if the rate of assisted breathing had been reduced, it would have allowed the excess gas entering Miller's lungs to escape adequately and the cardiac arrest would not have occurred. The doctors alleged other negligence by Dr. Cavens with respect to tests he did not order and his treatment of Miller after she went into cardiac arrest, but the alleged hyperinflation of her lungs clearly was the initial, precipitating negligent act that led to her death according to these doctors.

Dr. Cavens presented the testimony of two physicians who stated that his treatment conformed with the standard of care in all respects, that there was nothing he could have done differently to save Miller's life, and that she would have had a substantially greater chance of survival if she had come to emergency room earlier. As for charges that Dr. Cavens over-inflated Miller's lungs, they contended that because of the advanced stage of her asthma attack and inflammation and mucous blockage in the lungs' airways, essentially no air was getting into her lungs at all despite the efforts of the respiratory therapists and her cardiac arrest resulted from a lack of oxygen in the heart, not hyperinflation of the lungs. They also opined that it was unreasonable for Miller, given her severe asthma and history of hospitalizations, to wait as long as she did to seek emergency medical treatment.

At the conclusion of all the evidence, Zaberdac moved for judgment on the evidence with respect to Dr. Cavens' contributory negligence claim. The trial court granted this motion and also clarified to Dr. Cavens' attorney that he was precluded from arguing that any conduct of Miller before she went to the emergency room was the proximate cause of her death.

---

3. The original complaint also named Munster Community Hospital and the ambulance company as defendants; they were later dismissed from the action.

4. A fourth physician, the surgeon who operated on Miller, also testified as a plaintiff's witness and implicitly questioned some of the treatment Dr. Cavens provided, but he did not testify that Dr. Cavens' treatment fell below the applicable standard of care, nor did he state that negligence on Dr. Cavens' part was the cause of Miller's death.

The jury returned a verdict in Zaberdac's favor, and Dr. Cavens now appeals.

## Analysis

■ Dr. Cavens argues that the trial court erred in granting Zaberdac's motion for judgment on the evidence with respect to the contributory negligence claim. An appellate court uses the same standard of review as the trial court in determining the propriety of a judgment on the evidence. *Dughaish ex rel. Dughaish v. Cobb*, 729 N.E.2d 159, 167 (Ind.Ct.App.2000), *trans. denied.* "When the trial court considers a motion for judgment on the evidence, it must view the evidence in a light most favorable to the non-moving party." *Id.* "Judgment may be entered only if there is no substantial evidence or reasonable inferences to be drawn therefrom to support an essential element of the claim." *Id.*

■ The general rule on the issue of contributory negligence is that a plaintiff must exercise the degree of care that an ordinary reasonable person would exercise in like or similar circumstances. *Faulk v. Northwest Radiologists, P.C.*, 751 N.E.2d 233, 238–39 (Ind.Ct.App.2001) (citing *Memorial Hosp. of South Bend, Inc. v. Scott*, 261 Ind. 27, 37, 300 N.E.2d 50, 56 (1973)), *trans. denied.* Contributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to the harm the plaintiff has suffered, that falls below the standard to which the plaintiff is required to conform for his or her own protection. *Id.* at 239. A patient's contributory negligence operates as a complete defense to a medical malpractice claim. *Faulk*, 751 N.E.2d at 239. Indiana's Comparative Fault Act expressly excludes medical malpractice actions from its scope. Ind.Code § 34–51–2–1(b).

■ At the outset, we note that the question of contributory negligence does not arise except in a case where it has been shown that the defendant was guilty of negligence that was a proximate cause of injury. *See Hopper v. Carey*, 716 N.E.2d 566, 573 (Ind.Ct.App.1999), *trans. denied.* Here, the parties presented two starkly contrasting versions of what happened on July 21, 1996. Zaberdac's experts testified that Dr. Cavens was completely at fault for Miller's death, while Dr. Cavens' experts testified that he was not at all at fault for her death and that it resulted from the severity of her condition, her conduct, or a combination of the two. Thus, if the jury had wanted to accept the testimony of Dr. Cavens' experts in its entirety, it would have entered judgment for him and it would not have been necessary for the jury to consider the question of contributory negligence. However, "[a] trier of fact may believe one part of the testimony of a witness and disbelieve and reject another part." *Nelson v. State*, 525 N.E.2d 296, 297 (Ind.1988). Here, the evidence presented at trial at least allowed for the possibility that the jury could have believed portions of Zaberdac's expert witness testimony to the extent Dr. Cavens provided sub-standard medical care and rejected Dr. Cavens' expert witness testimony to the contrary, but also could have believed Dr. Cavens' experts to the extent they opined that Miller herself was negligent before she went to the emergency room. If the jury had viewed the evidence this way, a finding of contributory negligence was a factual possibility. The question we address is whether it was legally permissible in this case to raise such a defense.

Dr. Cavens presented expert testimony, contrary to Zaberdac's expert testimony, that Miller unreasonably delayed seeking treatment and overused her home medications before going to the emergency room, in contravention of the advice of her regular pulmonologist, Dr. Strek. The primary basis of Zaberdac's claim that Miller

could not have been contributorily negligent in a cause of action against Dr. Cavens is that there was no physician-patient relationship between Dr. Cavens and Miller until the moment she entered the emergency room. Thus, Zaberdac argues, any questionable conduct Miller might have engaged in before the establishment of that relationship was irrelevant in a malpractice action against Dr. Cavens because she owed no "duty" to him prior to that time. Statements made by the trial court when it granted Zaberdac's motion for judgment on the evidence indicate that it accepted his argument on this point.

Zaberdac emphasizes the following language found in an opinion from this court addressing contributory negligence in a medical malpractice action: " 'The creation of the relation of physician and patient gives rise to reciprocal duties to exercise due care: that of the physician to his patient, and that of the patient to his physician and himself in relation to the physician's treatment in endeavoring to effect a cure.' " *Fall v. White*, 449 N.E.2d 628, 633 (Ind.Ct.App.1983) (quoting 61 Am.Jur.2d *Physicians, Surgeons* § 302 (1981)). Zaberdac argues that this reference to "reciprocal duties" demonstrates that in a medical malpractice action, a patient owes no duty to a physician to take care of him or herself until such time as a physician-patient relationship is established with the physician that the patient claims has been negligent.

We conclude it is inappropriate in the contributory negligence context to characterize the issue as whether the patient owed a duty *to the physician* to exercise due care in his or her own treatment for the benefit of the physician. As noted, in the *Memorial Hospital* case that established the contributory negligence rule for medical malpractice actions in Indiana, our supreme court said the key question is

whether a plaintiff's conduct "falls below the standard to which he is required to conform *for his own protection.*" 261 Ind. at 36, 300 N.E.2d at 56 (emphasis added). Also, one commentator who has collected and analyzed numerous cases formulated the general rule regarding contributory negligence in medical malpractice actions as follows: "The defendant must establish that *the patient owes himself a duty of care,* that the patient breached that duty, and that this breach was the proximate cause of the injuries sustained." Madelynn R. Orr, *Defense of Patient's Contribution to Fault in Medical Malpractice Actions,* 25 Creighton L.Rev. 665, 670 (1992) (emphasis added). We also note the commentary to the Second Restatement of Torts, Section 463, from which *Memorial Hospital* derived its definition of contributory negligence, which states: "Contributory negligence differs from that negligence which subjects the actor to liability for harm done to others in one important particular. Negligence is conduct which creates an undue risk of harm to others. Contributory negligence is conduct which involves an undue risk of harm to the person who sustains it." This language strongly suggests that there is no requirement of "duty" owed by a plaintiff to a defendant in the contributory negligence context. Instead, the plaintiff owes a duty to him/herself to exercise reasonable care, but not to anyone else.

In addition, Zaberdac has failed to cite any case explicitly holding that there must be a "duty" relationship between a patient and physician at the time a patient is negligent in order for the physician to argue contributory or comparative negligence, or that has refused to allow a contributory/comparative negligence defense because of a lack of "duty." Our own research in this area has also failed to reveal such a case. *See generally Contributory Negligence, Comparative Negli-*

*gence, or Assumption of Risk, Other Than Failing to Reveal Medical History or Follow Instructions, As Defense in Action Against Physician or Surgeon for Medical Malpractice,* 108 A.L.R.5th 385 (2003). Nor have we been cited any case outside of the medical malpractice context that imposes a plaintiff-to-defendant duty requirement in order to assert contributory or comparative negligence. The cases Zaberdac cites in his brief place no legal importance on the existence, or lack thereof, of a physician-patient relationship at the time the patient was allegedly negligent in deciding whether the physician could claim contributory or comparative negligence on the patient's part.

For example, one case Zaberdac cites is *DeMoss v. Hamilton,* 644 N.W.2d 302 (Iowa 2002). In that case, a physician who was alleged to be negligent in treating a patient for a heart attack claimed the patient was comparatively negligent because he had had a previous heart attack, but thereafter failed to follow his previous doctor's advice to stop smoking and to exercise. The court held it was improper to allow the current doctor to claim comparative negligence, concluding:

> in a medical malpractice action, the defense of contributory negligence is inapplicable when a patient's conduct provides the occasion for medical attention, care, or treatment which later is the subject of a medical malpractice claim or when the patient's conduct contributes to an illness or condition for which the patient seeks the medical attention, care, or treatment on which a subsequent medical malpractice claim is based.

*Id.* at 306. The concern of the court appears to have been that such conduct by a patient may be a "but for" cause or cause in fact, but not proximate cause, of any injury that might result if a patient's conduct creates the need for treatment but the treatment is negligently provided. As the court stated:

> to be considered as and constitute contributory negligence in a medical malpractice action, a patients negligence *must have been an active and efficient contributing cause of the injury,* must have cooperated with the negligence of the malpractitioner, *must have entered into proximate causation of the injury,* and must have been an element in the transaction on which the malpractice is based.

*Id.* (emphasis added). However, although the patient in *DeMoss* did not have an ongoing physician-patient relationship at the time of the patient's alleged prior negligence, the court made no mention of this fact in the analysis section of the opinion, nor did it refer to any lack of "duty" owed by the patient to the physician as a relevant factor to consider.

█ We also note sound policy reasons for rejecting Zaberdac's proposed "reciprocal duty" requirement. Emergency room physicians such as Dr. Cavens work in high-risk, high-pressure environments, and in the typical case they will not have had a previous relationship with patients who come to them for treatment. Thus, under a "reciprocal duty" requirement, few emergency room physicians would ever be able to claim contributory negligence by a patient, no matter the egregiousness or temporal proximity of such negligence. If, on the other hand, Dr. Strek had happened to be at Munster Community Hospital on July 21, 1996, undertook to treat Miller, and it was clear Miller had been negligent immediately prior to arriving at the hospital, under a "reciprocal duty" analysis Dr. Strek likely could claim contributory negligence in a malpractice suit against her by virtue of their existing relationship. It simply would be illogical under a "reciprocal duty" requirement that Dr. Cavens

could not make the same claim. We decline to create what would effectively amount to an emergency room physician exception to the contributory negligence defense in medical malpractice actions. If anything, such physicians should be entitled to more, not less, protection from liability exposure. We hold that the existence of a physician-patient relationship at the time of a patient's alleged negligence is not required in order for a physician to assert a contributory negligence defense.[5]

Having rejected Zaberdac's "reciprocal duty" argument, we now turn to Zaberdac's closely related argument that any conduct of a patient occurring before seeking medical treatment cannot be considered contributory negligence. It has been said:

> Case law is replete with instances where the physician charged the plaintiff with contributory negligence for behavior that occurred before the patient sought treatment. The courts generally agree that the patient's prior conduct should not be considered in assessing damages.

Orr, 25 Creighton L.Rev. at 687. In the abstract, this statement is generally true. However, a closer look at the cases holding that pre-treatment conduct cannot be considered contributory negligence demonstrates that they have actually noted several exceptions to the general rule.

The Tennessee Supreme Court recently undertook a thorough examination of the circumstances in which a physician may assert comparative negligence on the part of a patient in *Mercer v. Vanderbilt University, Inc.*, 134 S.W.3d 121 (Tenn.2004).

In so doing, the court ultimately held "that a patient's negligent conduct that occurs prior to a health care provider's negligent treatment and provides only the occasion for the health care provider's subsequent negligence may not be compared to the negligence of the health care provider." *Id.* at 130. The court overruled *Gray v. Ford Motor Co.*, 914 S.W.2d 464 (Tenn. 1996), which allowed defendant-physicians to assert a plaintiff-patient's negligence in causing an initial injury that created the need for treatment. *Id.* However, the court also noted several circumstances under which it has generally been held appropriate to consider a patient's fault in a medical malpractice action, including a patient's delay in seeking or returning for medical treatment, failing to follow a physician's instructions, furnishing incomplete, false, or misleading information to a treating physician, and attempting to treat one's own injury before seeking professional treatment. *Id.* at 129. The court did not express disagreement with any of these holdings, and in fact mentioned but did not overrule an earlier Tennessee case that it characterized as one "in which a patient delays seeking or returning for medical treatment." *Id.* (citing *Volz v. Ledes*, 895 S.W.2d 677, 678, 680 (Tenn. 1995)). The court also noted that *Volz* "did not dictate the result" in the *Gray* case that it overruled. Thus, while the court in *Mercer* limited the instances in which a physician may claim contributory or comparative negligence by a patient for pre-treatment conduct, it did not completely bar such claims.

---

**5.** To the extent we referred to "reciprocal duties" in the *Fall* opinion, such language was not necessary to resolve the question before us in that case and was dicta. We were not asked in *Fall* to decide whether a defendant physician had to prove a patient owed the physician duty in order to claim contributory negligence in a malpractice action. Additionally, because we quoted an American Jurisprudence article in *Fall*, it is worth noting that the current American Jurisprudence discussion regarding medical malpractice and contributory negligence makes no reference to any "reciprocal duty" requirement. *See* 61 Am.Jur.2d 378 *Physicians, Surgeons, Etc.* § 280 (2002).

In a similar vein is *Fritts v. McKinne,* 934 P.2d 371 (Okla.Ct.App.1996), *cert. denied.* In that case, a physician who treated a patient injured in an automobile accident attempted to claim that the patient was negligent in causing the accident. The court rejected this attempt, stating that such negligence if any was irrelevant and unrelated to the medical treatment the patient received. *Id.* at 374. However, the court also expressly noted, "[u]nder certain circumstances, a patient's actions *prior* to seeking medical attention properly may be considered as evidence of contributory negligence." *Id.* (emphasis in original). The court stated that such circumstances include delays in seeking medical treatment, failing to provide an accurate medical history to a physician, and failing to follow a physician's advice and instructions. *Id. Mercer* and *Fritts* both stand for the proposition that although patient negligence creating the need for treatment cannot be claimed as contributory or comparative negligence, pre-treatment conduct can be considered as such in limited circumstances.

We acknowledge support for Zaberdac's position on this point coming from Comment m, Illustration 9 of Section 7 of the Third Restatement of Torts—Apportionment of Liability. That section, entitled "Effect of Plaintiff's Negligence When Plaintiff Suffers an Indivisible Injury," provides:

> Plaintiff's negligence (or the negligence of another person for whose negligence the plaintiff is responsible) that is a legal cause of an indivisible injury to the plaintiff reduces the plaintiff's recovery in proportion to the share of responsibility the factfinder assigns to the plaintiff (or other person for whose negligence the plaintiff is responsible).

Restatement (Third) of Torts—Apportionment of Liability § 7 (2000). Comment m to this section states, "in a case involving negligent rendition of a service, including medical services, a factfinder does not consider any plaintiff's conduct that created the condition the service was employed to remedy." Illustration 9 following comment m states:

> A is injured in an automobile accident but negligently delays seeking medical treatment from B, making that treatment riskier. B aggravates A's injuries by negligently providing medical treatment. In a suit in which A seeks to recover from B for the part of A's injuries caused by B's medical malpractice, the factfinder does not consider A's negligence in delaying seeking medical treatment. A's negligence produced the very condition that B undertook to treat.

This language does suggest that any pre-treatment conduct by a patient, including a negligent delay in seeking medical treatment, cannot bar or reduce a plaintiff's recovery in a medical malpractice action.

We are not inclined to adopt that position. First, we observe that introductory language in the Third Restatement of Torts—Apportionment of Liability makes it clear that it is intended to reflect "dramatic ... changes in the law since the publication of the Restatement Second of Torts," specifically, the change from contributory negligence to comparative fault in an overwhelming number of jurisdictions. *Id.* § 1 cmt. (a). Indiana has expressly refused to adopt comparative fault with respect to medical malpractice actions. Thus, the extent to which we should be guided by the Third Restatement of Torts—Apportionment of Liability when considering a contributory negligence issue is questionable. Instead, the Second Restatement of Torts and its contributory negligence principles that we have already discussed would appear to provide more relevant guidance.

Second, the illustration refers to A suing B "for the part of A's injuries caused by B's medical malpractice...." The illustration as written seems to apply only to situations in which a clear distinction can be drawn between injuries caused by a patient's own negligence and injuries caused by a doctor's superseding negligence. *See Whitehead v. Linkous*, 404 So.2d 377, 379 (Fla.Ct.App.1981) (quoting *Matthews v. Williford*, 318 So.2d 480, 483 (Fla.Ct.App.1975)) (holding that conduct of a patient that may have contributed to his illness or medical condition and furnished the occasion for medical treatment "is not available as a defense to malpractice which causes a distinct subsequent injury here the ultimate injury, wrongful death."). Here, Zaberdac sought recovery of damages for Miller's death. Dr. Cavens presented expert testimony both that Miller waited an unreasonably long period of time to seek medical treatment and that such delay substantially reduced her chances of survival. It is unclear how Miller's alleged negligence that purportedly directly contributed to her death can be fairly separated from Dr. Cavens' alleged negligence that also purportedly directly contributed to the same result, her death.

Finally, it is unclear whether the illustration accurately reflects the state of the law in jurisdictions that have considered whether a delay in seeking medical treatment may be considered contributory or comparative negligence. The *Mercer* and *Fritts* cases seem to reflect the accepted view that a pre-treatment delay in seeking medical treatment and other limited pre-treatment circumstances can be considered contributory negligence, even though as a general rule a patient's pre-treatment conduct is irrelevant in medical malpractice actions.[6]

In the present case, Dr. Cavens essentially argues that one aspect of Miller's negligence was her failure to follow the advice of her treating pulmonologist, non-defendant Dr. Strek, by overusing her home medication and waiting too long to seek emergency room treatment. Additionally, Dr. Cavens argues that Miller unreasonably failed to seek timely medical attention. Dr. Cavens primarily cites cases from other jurisdictions for the proposition that a delay in seeking medical treatment may constitute contributory negligence. *See, e.g., Smith v. Perlmutter*, 145 Ill.App.3d 783, 99 Ill.Dec. 783, 496 N.E.2d 358, 361 (1986) (holding evidence supported instructing jury on comparative negligence where patient awoke in the night with severe chest pains but did not seek medical treatment and later died of a heart attack); *Taylor v. Sauls*, 772 So.2d 686, 695 (La.Ct.App.2000) (holding there was sufficient evidence of comparative fault where patient and spouse were aware, following previous visit to doctor, that patient's condition was deteriorating but did not seek timely medical attention before she died), *writ denied*. This court

---

6. To the contrary appears to be *Piper v. Moore*, 410 So.2d 646 (Fla.Ct.App.1982), which held in a one paragraph opinion, without any elaboration, factual detail, or analysis, that a patient's delay in seeking medical treatment, even if negligent, was not a legal cause of her death. The case cites *Whitehead* and *Matthews*, which we have already cited and which do not discuss delays in seeking medical treatment, and another case, *Borenstein v. Raskin*, 401 So.2d 884 (Fla.Ct.App.1981), which held that it was improper to instruct the jury on comparative negligence where there was no evidence that a patient's delay in seeking medical treatment was a proximate cause of her death. We agree that a delay in seeking treatment must be proven to be a proximate cause of a subsequent injury, but decline to follow *Piper* to the extent it seems to suggest a delay in seeking treatment could never be the basis of a contributory negligence defense in a medical malpractice action.

has also held it was proper to instruct a jury on contributory negligence where there was evidence, in part, that a woman waited three to four weeks to seek medical evaluation of her breast that was swollen, sore, and red, and that turned out to be cancerous. *King v. Clark,* 709 N.E.2d 1043, 1047–48 (Ind.Ct.App.1999), *trans. denied.* As already noted, the proposition that a negligent delay in seeking medical treatment may be considered contributory or comparative negligence appears to be accepted even in jurisdictions that have recently restricted the availability of contributory or comparative negligence claims in medical malpractice actions.

Zaberdac counters that Indiana has only recognized two specific factual scenarios in which a patient could be found contributorily negligent in a medical malpractice action: (1) by providing a physician with inaccurate or misleading medical history information, or (2) by failing to the follow the instructions of a *"defendant* physician." Appellee's Br. p. 4 (emphasis added). Zaberdac contends that Miller's allegedly negligent conduct does not fall under either of these scenarios. In support of his argument, Zaberdac cites *Fall, Faulk,* and *King.* Zaberdac also cites to two Indiana pattern jury instructions that list these two factual scenarios as possibilities for finding contributory negligence in a medical malpractice action; there are no other pattern instructions regarding medical malpractice and contributory negligence. *See* Ind. Pattern Jury Instructions (Civil) 23.17 and 23.18. However, neither *Fall, Faulk,* nor *King* contain language that expressly limits the possibility of contributory negligence to these two scenarios. In fact, this court specifically stated in *Smith v. Hull,* 659 N.E.2d 185, 191 (Ind.Ct.App. 1995), *trans. denied,* that there was no authority "for the proposition that a patient only has a duty to exercise reasonable care in these two limited instances."

Indeed, *King* clearly recognized that a negligent delay in seeking medical treatment may constitute contributory negligence. Additionally, Zaberdac argues that a patient may be contributorily negligent by failing to follow the instructions of a "defendant physician," which implies that *Fall, Faulk,* and *King* limited their holdings to situations in which the patient failed to follow the advice of the doctor being sued, and which would not be the case here. However, nothing in the language of those cases expressly limits their holdings to such a situation and none refer to a failure to follow the instructions of a "defendant physician."

No Indiana case explicitly discusses whether a doctor being sued for malpractice may claim that a patient was contributorily negligent by failing to follow the advice of a non-defendant physician. The only reported case where this defense was even attempted by a doctor is *Weinstock v. Ott,* 444 N.E.2d 1227 (Ind.Ct.App.1983). In that case, the defendant physician claimed the plaintiff patient was contributorily negligent because she failed to follow the advice of a non-defendant physician and discharged herself from a hospital against medical advice. The jury found in favor of the patient. On appeal, this court held that whether the patient was contributorily negligent "was a question of fact for the jury" and that she was not contributorily negligent as a matter of law. *Id.* at 1239. The opinion seems to assume that the issue of contributory negligence was properly raised and argued before the jury based on the patient's alleged failure to follow the advice of a non-defendant physician, although it is true that the plaintiff in that case apparently did not attempt to argue that contributory negligence could not be raised. Also, it appears to us that Zaberdac's argument that a doctor may claim contributory negligence for a pa-

tient's failing to follow the doctor's *own* advice, but not the advice of any other doctor, is simply another way of arguing for a "reciprocal duty" requirement, which we have already rejected.

Zaberdac again responds with respect to Dr. Cavens' claim of Miller's allegedly negligent delay in seeking medical treatment that in each of the cases cited by Dr. Cavens, both from Indiana and from other jurisdictions, there was "an ongoing patient-physician relationship" between the plaintiff and defendant when the plaintiff allegedly delayed seeking medical treatment. Appellee's Br. p. 9. This indeed was true in *King,* as the patient was a regular patient of the defendant physician at the time she delayed seeking treatment. This also appears to have been true in the extra-jurisdictional cases that Dr. Cavens cited. However, after reviewing *King* and the seven out-of-state cases cited by Dr. Cavens,[7] there is no language in those opinions indicating that there *must* be "an ongoing patient-physician relationship" at the time a patient delays seeking medical treatment in order to permit a doctor to raise a contributory or comparative negligence defense; that simply appears to have been the fact pattern in those cases but the courts did not assign any legal importance to such facts. Again, accepting Zaberdac's argument on this point would improperly prohibit emergency room doctors in many, if not most, cases from claiming a defense that would be available to other doctors.

Zaberdac also contends that Miller's allegedly negligent conduct before seeking treatment in the emergency room merely created the need for treatment and, there-

fore, cannot form the basis of a contributory negligence defense. Dr. Cavens does not dispute Zaberdacs legal claim that patient conduct creating the need for treatment cannot be considered contributory negligence in a medical malpractice action based on subsequent physician negligence, and we readily accept that proposition. *See DeMoss,* 644 N.W.2d at 306; *Mercer,* 134 S.W.3d at 130. Although Indiana cases have not previously framed the issue as such, we have held that in order to constitute contributory negligence, a patients alleged conduct "must unite in producing the injury, being simultaneous and cooperating with the fault of the defendant and entering into the creation of the cause of action." *Smith,* 659 N.E.2d at 192. We believe this proposition both generally sets forth the requirement that in order to be contributory, patient negligence must be a proximate cause of any resulting injury, and specifically that patient conduct merely creating the need for treatment cannot be considered contributory negligence.

We agree with Dr. Cavens that the conduct by Miller he claims was contributorily negligent was not what created the need for treatment in this case. The asthma attack itself, not conduct by Miller, caused the *need* for treatment. Miller needed to go to the hospital regardless of her response to the asthma attack or her conduct after it began, as evidenced by the failure of her home medications to quell the attack. If Dr. Cavens was attempting to claim, for example, that Miller had exacerbated her asthmatic condition by smoking, or had otherwise brought on her attack by her conduct, it would appear that such

7. *Pantaleo v. Our Lady of the Resurrection Medical Center,* 297 Ill.App.3d 266, 231 Ill. Dec. 421, 696 N.E.2d 717, 728–29 (1998), *appeal denied; Smith,* 496 N.E.2d at 361; *Taylor,* 772 So.2d at 695; *Magee v. Pittman,* 761 So.2d 731, 737–38 (La.Ct.App.2000), *writ.*

*denied; Roers v. Engebretson,* 479 N.W.2d 422, 424 (Minn.Ct.App.1992); *Eoff v. Hal & Charlie Peterson Foundation,* 811 S.W.2d 187, 191 (Tex.App.1991); *Harding v. Bell,* 57 P.3d 1093, 1098 (Utah 2002).

conduct would fall under the category of pre-treatment conduct that could not be considered contributorily negligent for purposes of a medical malpractice action. Such conduct only would have created the need for treatment. *See Harding v. Deiss,* 300 Mont. 312, 3 P.3d 1286, 1289 (2000) (holding patient could not be found contributorily negligent by causing asthma attack because she went horseback riding with knowledge that she was allergic to horses). However, Miller's conduct in delaying seeking treatment and overmedicating herself did not create the need for treatment but, according to expert testimony Dr. Cavens presented at trial, was unreasonable and complicated his ability to treat her acute asthma attack and greatly reduced Miller's chances of survival.

Zaberdac also contends that Millers conduct before seeking treatment cannot be considered "simultaneous" with Dr. Cavens actions in the emergency room as required by Indiana cases such as *Smith.* Dr. Cavens acknowledges that the patient conduct must be "simultaneous" and "cooperate with" the alleged fault of the physician in order to pursue a contributory negligence defense but argues this requirement was met here. The parties thus basically differ on where to draw the line as to what patient conduct can be considered "simultaneous" with a doctor's treatment. Zaberdac believes the only relevant time period begins with Miller's initial presentation to Dr. Cavens at around noon on July 21, 1996, and that the only conduct on her part that could be considered contributorily negligent would have had to occur after that time, and there is no evidence of such conduct. Dr. Cavens believes the line should be pushed back to 7 a.m. on July 21, when her asthma attack began in earnest and which required eventual medical attention, and that Miller's conduct after 7 a.m. should be evaluated for contributory negligence purposes.

We note the following commentary:

A defense of contributory negligence requires proof that the patient's negligence operated simultaneously and in cooperation with the physician's negligence to cause the injury for which recovery is sought. *Simultaneity in this context does not necessarily mean that the negligence of the patient and the physician must occur together temporally.*

*Contributory Negligence etc.,* 108 A.L.R.5th at 406 (emphasis added). Clearly, it would be impossible in most cases for a patient to be negligent at the precise moment in time when a doctor was negligent. It is also evident that in most cases, delays in seeking medical treatment would occur in time before the negligence of a doctor in treating the ailment or injury, but such conduct is widely accepted as a proper basis for claiming contributory negligence.[8]

We conclude that with respect to an acute injury, illness, or medical episode, the weight of authority indicates that patient conduct after the episode begins that exacerbates the injury or illness or complicates treatment, which occurs during the acute episode for which the patient requires medical treatment, and which conduct is proven to be unreasonable and a proximate cause of a resulting injury or death, may be considered contributory negligence. This would encompass, for example, failing to seek timely medical treatment for the injury or illness, or failing to

---

8. We are not considering here patient negligence that clearly occurs well after a doctor's negligence, which is not a proper basis for finding contributory negligence but may be considered with respect to mitigation of damages. *See Harris v. Cacdac,* 512 N.E.2d 1138, 1140 (Ind.Ct.App.1987), *trans. denied.*

follow a doctor's explicit instructions about how to respond to the injury or illness, but exclude any conduct that created or contributed to the injury or illness in the first place. Heart attack cases from other jurisdictions are helpful on this point. For example, while it is generally accepted that a patient's lifestyle habits that increased the risk of a heart attack cannot be considered contributory negligence, a delay in seeking medical treatment after experiencing the warning signs of a heart attack, such as severe chest pains, may be considered contributory negligence. *Compare DeMoss*, 644 N.W.2d at 306, *with Harding v. Bell*, 57 P.3d 1093, 1098 (Utah 2002). In terms of proximate cause, in the event the patient receives negligent medical treatment and dies, patient conduct that led to the heart attack in the first place is too remote to be considered as contributory negligence, but patient conduct from the outset of the heart attack that immediately and directly reduced his or her chances of survival is not. Such conduct directly co-operates and unites with, and is in close temporal proximity to, a physician's negligence if death or another injury results.

 In the present case, we conclude that the trial court should have permitted the jury to consider Dr. Cavens' claims of contributory negligence by Miller because of her delay in seeking treatment and overuse of medication, in contravention of Dr. Strek's advice.[9] Both claims are related to and occurred during the medical event for which Miller sought treatment; this conduct did not create the need for treatment but exacerbated her attack. Dr. Cavens presented expert testimony both that this conduct was unreasonable, especially in light of Miller's medical history, and greatly reduced her chances of survival. The law both in Indiana and from

other jurisdictions leads to the conclusion that such conduct, when supported by evidence that it was negligent and a proximate cause of resulting injury or death, may properly be considered contributory negligence. The lack of a pre-existing physician-patient relationship between Dr. Cavens and Miller at the time of her alleged negligence does not defeat Dr. Cavens' contributory negligence claim as a matter of law, nor does the fact that Miller's conduct was not strictly contemporaneous with Dr. Cavens'.

 Zaberdac also essentially argues that being prevented from arguing contributory negligence to the jury and receiving jury instructions on that issue did not prejudice Dr. Cavens. We disagree. Zaberdac notes Dr. Cavens was allowed to argue and did argue that Miller's condition when she arrived at the hospital was such that she was likely to die regardless of the treatment Dr. Cavens provided. However, the jury was still required to find for Miller if it concluded Dr. Cavens provided negligent treatment and such treatment was *a* proximate cause of her death, even if other factors, such as Miller's severe condition, also contributed to her death. *See, e.g., Elder v. Fisher*, 247 Ind. 598, 606, 217 N.E.2d 847, 852 (1966). If Dr. Cavens had been allowed to argue and receive a jury instruction on contributory negligence, the jury would have been required to return a verdict for him if it found that negligence on Miller's part was a proximate cause of her death, even if it also found that Dr. Cavens provided sub-standard treatment that was *a,* but not the *only,* proximate cause of her death. *See, e.g., Faulk*, 751 N.E.2d at 239. We conclude that the trial court erroneously granted Zaberdac's motion for judgment

---

9. We need not delineate in this case the full extent of factual scenarios in which a doctor may assert contributory negligence by a patient.

on the evidence regarding Miller's contributory negligence claim and that such error prejudiced Dr. Cavens' ability to present a proper defense.

## Conclusion

The trial court should have permitted Dr. Cavens to present his contributory negligence defense to the jury and its refusal to do so prejudiced Dr. Cavens. We reverse the judgment against Dr. Cavens and remand for further proceedings consistent with this opinion.

Reversed and remanded.

NAJAM, J., and SULLIVAN, J., concur.